UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

Samantha Jeanne Gilmore,

Plaintiff,

vs.

Kilolo Kijakazi, Acting
Commissioner of Social Security,[1]

Defendant.

Civil Action No. 5:20-2376-KDW

ORDER

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court affirms the Commissioner's decision for the reasons discussed herein.

I.    Relevant Background

A.    Procedural History

In November 2014, Plaintiff filed an application for DIB alleging a disability onset date of October 1, 2013. Tr. 163-64.[2] Her application was denied initially and upon reconsideration. Tr. 71, 83. Plaintiff requested a hearing and on September 8, 2016, a hearing was held before

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Kilolo Kijakazi for Andrew Saul as Defendant in this action.

[2] At the same time, Plaintiff also filed an application for Supplemental Security Income ("SSI"), Tr. 165-70, but that application was denied because the Social Security Administration determined Plaintiff had too much income, Tr. 84-87.

Administrative Law Judge ("ALJ") Ethan Chase. Tr. 42-61. On January 13, 2017, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 560-74. After the Appeals Council denied her request for review, Tr. 580-85, Plaintiff appealed the unfavorable decision to the United States District Court for the District of South Carolina and obtained an Order, dated March 29, 2019, reversing the Commissioner's decision and remanding the case for further proceedings, Tr. 615-26. Based on the court's order, on May 7, 2019, the Appeals Council vacated the final decision of the Commissioner and remanded the matter for "further proceedings consistent with the order of the court." Tr. 653-54. The Appeals Council noted that Plaintiff had filed a subsequent claim for disability benefits on February 2, 2018[3] and its action on the current claim "render[ed] the subsequent claim duplicate." Tr. 653. The Appeals Council instructed the ALJ to "consolidate the claims files, associate the evidence, and issue a new decision on the consolidated claims (20 CRF 404.952 and HALLEX I-1-10-10)." *Id.*

ALJ Chase conducted a second administrative hearing on September 27, 2019. Tr. 533-59. On October 22, 2019, the ALJ issued an unfavorable decision denying Plaintiff's claim. Tr. 509-522. On November 25, 2019 Plaintiff submitted "Exceptions to Hearing Decision Of October 22, 2019." Tr. 760-67. The Appeals Council considered Plaintiff's written exceptions, but "found no reason under [their] rules to assume jurisdiction." Tr. 502. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on June 23, 2020. ECF No. 1.

B.    Plaintiff's Background

Plaintiff was born in April 1973 and was 40 years old as of her alleged onset date of October

---

[3] Plaintiff filed a new application for DIB alleging a disability onset date of November 1, 2011. Tr. 771-72. Plaintiff's February 2, 2018 DIB claim was denied initially on June 18, 2018, Tr. 597, and upon reconsideration on August 1, 2018, Tr. 611. On August 22, 2018, Plaintiff requested a hearing by an ALJ. Tr. 669-70.

1, 2013. Tr. 223. In her form Disability Report-Adult dated December 4, 2014, Plaintiff indicated that she completed high school and had no other specialized job training, trade, or vocational schooling. Tr. 228. She listed her past relevant work ("PRW") as sales associate, packer, and childcare provider. *Id.* Plaintiff indicated she stopped working on May 31, 2013, due to her medical conditions and because she "was in a car accident and the company said to call in and when they need [her] they would contact [her] but never contacted [her] back for work." Tr. 227. Plaintiff noted that her conditions became severe enough to keep her from working on October 1, 2013. *Id.* She listed her medical conditions as spine and neck problems and fused C6-C7. *Id.* In a Disability Report-Appeal dated February 2, 2015, Plaintiff reported a change in her condition that occurred December 10, 2014. Tr. 249. Plaintiff indicated she had "begun shaking and experiencing numbness more in the left arm but have it in the right arm." *Id.* Regarding her daily activities Plaintiff indicated that her conditions keep her from standing long periods of time for cooking, she needs help washing her hair and getting dressed, and her conditions keep her from sleeping. Tr. 252. In a subsequent Disability Report-Appeal dated August 6, 2015, Plaintiff did not report any changes in her condition but noted that her activities were "still limited due to [her] conditions and [she] can care for [her] personal needs but it takes [her] a long time and [she has] to space things out." Tr. 262.

C.    The 2019 Administrative Hearing

Plaintiff's second administrative hearing was held on September 27, 2019; Plaintiff appeared with her counsel, Attorney W. Daniel Mayes, and testified before ALJ Chase. Tr. 533-59. Vocational Expert ("VE"), Dr. Arthur F. Schmitt, also appeared and testified. Tr. 533. Plaintiff's counsel noted the case was on remand from the District Court on the issue regarding Plaintiff's headaches. Tr. 536. Counsel provided a brief opening statement regarding Plaintiff's

hand tremors and limits on her ability to reach and do tasks requiring fine dexterity, thereby eliminating the ALJ's prior finding that she was capable of performing sedentary work. Tr. 537.

1. Plaintiff's Testimony

In response to questions from the ALJ, Plaintiff confirmed her birthdate and she stated that she graduated from high school. Tr. 538. Plaintiff testified that she last worked in 2011 and at that time she was working in a daycare. *Id.* She confirmed that before that job she worked as a cashier at The Pantry, Lowe's and Piggly Wiggly. *Id.*

The ALJ noted that Plaintiff's date last insured was December 2016, and he reminded Plaintiff that in responding to his questions she needed to think about how things were going before that date. Tr. 538. The ALJ noted further that the decision that was remanded was issued shortly before Plaintiff's date last insured and she had given some testimony then. Tr. 538-39. In an effort to refresh Plaintiff's memory, the ALJ stated he would cover Plaintiff's testimony briefly and she could indicate if anything was different. Tr. 539.

Plaintiff testified that she stopped working at the daycare because she was laid off, but stated that if she was not laid off, she would not be working there because she is unable to lift more than five pounds. Tr. 539. The ALJ noted that Plaintiff had testified previously that her lifting limit was ten pounds. *Id.* Plaintiff stated that since then she has had a third neck surgery and she thinks that five pounds is now her lifting limit. *Id.* Plaintiff confirmed that her neck problems affected her arms and she has numbness in both arms. Tr. 539-40. Plaintiff affirmed that the numbness goes down into her hands and it gets to the point that she "can't feel things." Tr. 540. Plaintiff stated that she would not know it if a pin were stuck in her finger. *Id.* Plaintiff testified that the hand numbness started before her surgery and that after her last surgery the numbness has gotten worse. *Id.* Plaintiff testified that she has pain from the cervical area of her neck and in her shoulders going

down into her arms, and that has all gotten worse. Tr. 540-41. Plaintiff testified that she was told

that she had permanent damage. Tr. 541. Plaintiff stated that she was given an EMG test, but she

could not recall when she had it, whether it was before or after her last surgery, or if it had any

positive results. Tr. 541-42. Plaintiff testified that she is still having trouble picking up small

objects like buttons, pins, or coins and with opening jars or picking up larger objects like cups or

dishes. Tr. 542. Plaintiff was able to recall her prior testimony that she had problems standing for

a long time, but she stated that she did not know why she was having trouble standing. *Id.* Plaintiff

stated that standing up makes her neck feel worse and she can stand for about 15 minutes. Tr. 542-

43. When asked to describe her headaches, Plaintiff testified that it feels as though someone is

using a vice grip on her whole head and twisting it. Tr. 543. Plaintiff stated that the headaches are

triggered by loud music, bright lights, and certain smells. *Id.* Plaintiff stated that before December

2016 she was having headaches three to four times a week, but she did not know how long it lasted.

Tr. 543-44. Plaintiff testified that she is still getting headaches and she has "had one for this whole

week, actually." Tr. 544. Plaintiff confirmed that in 2016 she was taking medicine for her various

issues that helped some, but there were side effects. *Id.* She stated the pain medication "just eased

it" but did not take the pain away permanently. *Id.* She stated that on a ten-point scale, after taking

medication her pain was "about a five." Tr. 545. She testified that the pain is "a ten when [she is]

not on meds." *Id.* Plaintiff confirmed that she is taking the same medication that she was taking in

2016 and still having the same side effects of drowsiness and dizziness. *Id.* She confirmed that

with the drowsiness she would fall asleep, and the dizziness sometimes made her unable to stand

up and walk for a while without having to sit down. *Id.* Plaintiff testified that she has hand tremors

that are either from Guillain-Barre or from her neck issues. Tr. 546. Plaintiff stated that she is on

two different medications for the tremors but she still has them. *Id.* Plaintiff testified that because

of her hands she needs help with doing things, and her husband helps her dress. *Id.* Plaintiff stated that she tries to cook but sometimes drops things when cooking. *Id.* She stated that she is able to eat by herself and hold her utensils and cups but she is "very careful" and does things slower. Tr. 547. The ALJ noted that Plaintiff testified previously that another side effect of the medications was mood swings. *Id.* Plaintiff was unable to recall that testimony but affirmed that was still a side effect. *Id.*

In response to questions from her attorney Plaintiff confirmed that in December 2016 she was on medications for migraine headaches. Tr. 548. Plaintiff testified that she could take the medication when she felt a migraine starting and that "[s]ometimes it would help and then there was times [it] wouldn't help." *Id.* Plaintiff stated that it would take about two hours for the medication to work. Tr. 549. Plaintiff testified that her tremors had gotten worse over the relevant period. *Id.* She confirmed that in February 2015, a doctor from Tide Water Neurology noted that her tremor was worse on the right side. *Id.* The doctor had also noted that the tremors were not having a big impact on Plaintiff's daily activities other than difficulty holding eating utensils and writing. Tr. 549-50. Plaintiff's attorney noted that there was not a lot of talk about the tremors prior the beginning of 2015, and Plaintiff confirmed that she "just wasn't talking to them too much about it" because she had other issues on her mind. Tr. 550. Plaintiff testified that after her surgery in 2015 she started having issues where she would "black out" or have seizure-like activity. Tr. 551. She stated that doctors said it was related to her migraines—that if they get too severe, she either blacks out or goes into having a seizure. *Id.* Counsel noted that the EEG did not show active seizure activity, and Plaintiff confirmed that she was not having epileptic seizures but was having "a type of seizure." *Id.* She stated she started having issues with this before the end of 2016, and she described an episode where she blacked out and her husband called EMS and she was taken to

the emergency room. Tr. 552. Plaintiff stated that she sometimes has smaller episodes at night

when she is in bed and she will "just lay there and let them break their way through. I just work

through them." Tr. 552-53.

Plaintiff's counsel noted that after the last hearing Plaintiff was sent out for a consultative

examination and the doctor noted that Plaintiff began crying during a range of motion test on her

arm. Tr. 553. Plaintiff testified that when she reaches at certain lengths, she gets pain in both arms

and she indicated the pain was from the top of her arm down to her elbow. *Id.*

2. VE's Testimony

The ALJ noted that the only jobs under consideration were daycare worker and head cashier

at a supermarket and convenience store. Tr. 555. The VE classified these jobs as customer service,

Dictionary of Occupational Titles ("DOT") 299.367-010, SVP 4, semi-skilled, light; and daycare,

DOT 359.677-018, SVP 4, semi-skilled, medium. *Id.* The ALJ asked the VE to assume a

hypothetical individual of Plaintiff's age, education, and work experience with the following

limitations:

> limited to sedentary work with only occasional postural, but no climbing ladders,
> ropes, or scaffolds, may frequently reach, handle, and finger and feel, but may only
> reach overhead occasionally, should avoid hazards and unprotected heights, should
> avoid bright flashing lights, so similar visual stimuli, no more than a moderate noise
> level, would miss one more day per month routinely.

*Id.* The ALJ asked the VE if this person could perform Plaintiff's past work and, after confirming

the level of work was sedentary, the VE testified that the person would be unable to do either of

Plaintiff's prior jobs. Tr. 555-56. The VE identified other work that the individual could perform

consisting of the following:

> Ticket seller, 211.467-030, 2, unskilled, sedentary, they're also light in the
> DOT, but I interpolated them. I got 75,000 at sedentary. Telephone quotation
> clerk, 237.367-040, 2, unskilled, sedentary, 283,000 nationally. That's also

> interpolated for sedentary. A weight tester, 539.485-010, 2, unskilled, sedentary, 430,000 nationally.

Tr. 556. The ALJ asked the VE to assume the same limits as in the first hypothetical "but reduce the reaching, handling, finger[ing], and feeling all to occasional." *Id.* The VE testified the individual could do the job of surveillance system monitor[4] and telephone quotation clerk, but that he would eliminate the ticket seller position. *Id.* The ALJ asked if the individual would be able to perform the identified jobs "if the individual would have the same limits but would be off task 20% of the time routinely." *Id.* The VE opined that "with that hypothetical, an individual could not do past relevant work or any work [he] mentioned. It would be unemployable and this is based on [his] experience." Tr. 557.

The ALJ asked if his limits involving overhead reaching and exposure to light and noise levels were covered by the DOT. Tr. 557. The VE stated they were not in the DOT but were based on his experience. *Id.* The VE also stated that the information regarding missing days from work was not in the DOT but based on his experience. *Id.*

Plaintiff's counsel asked the VE if the identified jobs would be precluded "if the individual was missing two to three days a month versus one day" and the VE opined that, based on his experience, the "hypothetical individual would be unemployable." Tr. 557. The VE confirmed that would be after missing two days. *Id.* Counsel asked if sedentary, unskilled jobs generally required use of the hands most of the day. Tr. 558. The VE responded: "Not necessarily. The surveillance system monitor and telephone quotation clerk is not requiring the use of hands all day." *Id.* The VE confirmed there would be no significant erosion of the sedentary occupational base with limitations of limited hand use. *Id.*

---

[4] The court notes that surveillance system monitor was not one of the exemplar jobs the VE identified.

8

With no further questions for the VE, the hearing closed. Tr. 559.

II.    Discussion

    A.    The ALJ's Decision

In his October 22, 2019, decision, the ALJ made the following findings of fact and conclusions of law:

> 1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2016.
>
> 2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of October 1, 2013 through her date last insured of December 31, 2016 (20 CFR 404.1571 *et seq.*).
>
> 3.    Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the cervical spine; tremor; and headaches (20 CFR 404.1520(c)).
>
> 4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following additional limitations: occasionally performing postural activities, but never climbing ladders, ropes, or scaffolds; frequently reaching, handling, fingering, and feeling, but only occasionally engaging in overhead reaching; must avoid exposure to heights and hazards. Because of headaches, she must avoid bright/flashing lights or similar visual stimuli; should be exposed to no more than moderate noise levels; and would miss one day of work per month.
>
> 6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).
>
> 7.    The claimant was born on April 27, 1973 and was 43 years old, which is defined as a younger individual age 18-44, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from October 1, 2013, the alleged onset date, through December 31, 2016, the date last insured (20 CFR 404.1520(g)).

Tr. 514-17, 520, 522. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on June 23, 2020. ECF No. 1.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing

considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary

12

sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

Plaintiff asserts that (1) the ALJ did not explain his findings regarding Plaintiff's residual functional capacity ("RFC") as required by SSR 96-8p, and (2) the ALJ erred in his evaluation of Plaintiff's subjective symptomology. Pl.'s Br. 12-25, ECF No. 20. The Commissioner asserts that substantial evidence supports the ALJ's RFC assessment and his evaluation of Plaintiff's subjective complaints. Def.'s Br. 15-28, ECF No. 22.

1.     The ALJ's RFC Assessment

The ALJ determined that Plaintiff had the RFC to perform sedentary jobs with certain limitations. Tr. 517. Plaintiff argues the ALJ failed to properly consider her limited ability to use her upper extremities, and he does not explain properly the finding that she would miss one day of work each month. Pl.'s Br. 13, 15. The Commissioner argues that "Plaintiff's arguments are nothing more than an impermissible request for this Court to second guess the ALJ's fact-finding, a request that is impermissible in substantial-evidence review." Def.'s Br. 16.

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.*

13

(emphasis in original). At the administrative hearing level, the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546. An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3) and (4). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7. The ALJ must discuss the claimant's ability to "perform sustained work activities in an ordinary work setting" on a regular work schedule. *Id.* Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

a. Plaintiff's Use of Upper Extremities

In his RFC assessment, the ALJ limited Plaintiff to "frequently reaching, handling, fingering, and feeling, but only occasionally engaging in overhead reaching[.]" Tr. 517. The ALJ stated that in making his RFC finding he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." *Id.* The ALJ noted that he also considered the opinion evidence in accordance with 20 CFR 404.1527. *Id.* As part of his RFC determination, the ALJ considered Plaintiff's testimony, the objective medical findings, and medical source opinions. Tr. 517-20.

Plaintiff argues that, although the ALJ noted that a December 2017 EEG study showed no slowing or epileptic activity, the ALJ failed to consider evidence documenting problems that led to the EEG testing including evidence about her syncopal events. Pl.'s Br. 13-14. The

Commissioner argues that the ALJ considered all the relevant evidence related to Plaintiff's upper extremities, accounted for any limitations in his RFC finding, articulated his reasons for his findings, and supported those reasons with substantial evidence from the record. Def.'s Br. 16.

At Step Two of the sequential evaluation process the ALJ found that Plaintiff's tremor was a severe impairment and that her syncopal episodes were non-severe. Tr. 515. The ALJ noted:

> Moreover, although the claimant has experienced some syncopal episodes, requiring seizure medication, there is no clear etiology supporting functional limitations from this condition prior to the date last insured. Specifically, in February 2015, the MRI of her brain was negative. (Exhibits 7F; 11F; 12F; 18F). Additionally, there is no documentation that these minor medical problems [including Plaintiff's hypertension and low back pain] imposed recurrent vocationally restrictive limitations for a period of 12 continuous months. Consequently, these minor medical problems resulted in no more than a combination of slight abnormalities. As a result, I find that each of these impairments had no more than a minimal effect on the claimant's ability to perform work-related activities and were non-severe through the date last insured.

Tr. 515. In making this finding the ALJ cites to Progress Notes dated 3/2/2015 to 6/9/2015 from SC Sports Medicine & Orthopaedic Center (Ex. 7F, Tr. 414-58); medical records dated 7/28/15 to 8/3/16 from Dr. Walter Leventhal (Ex. 11F, Tr. 470-75); a Consultative Examination Report dated 11/8/2018 from Dr. William F. Maguire (Ex. 12F, Tr. 476-501; and Progress Notes dated 9/21/2015 to 7/5/2018 from Tidewater Neurology (Ex. 18F, Tr. 1908-59). The Progress Notes from Tidewater Neurology are the records that Plaintiff argues the ALJ failed to consider.

At Step Three the ALJ stated that he considered the combined effects of Plaintiff's impairments and that he "specifically considered the cumulative effects of the impairments on the claimant's ability to work." Tr. 516. The ALJ found the following:

> While the combination of the claimant's impairments imposed some limitations on her level of functioning, I cannot find any limitations in the claimant's ability to have carried out her activities of daily living; therefore, the record fails to demonstrate that the claimant's ability to perform the residual functional capacity below was compromised by the combined effects of her impairments.

15

*Id.* In making his RFC finding, the ALJ noted that in February 2015 Plaintiff reported "increasing upper extremity tremors over the past few years particularly on her right side." Tr. 518. The ALJ stated that on examination Plaintiff "had a high frequency upper extremity kinetic, as opposed to resting, tremor; however, she retained 5/5 muscle strength." *Id.* He again cited to a subsequent negative brain MRI. *Id.* The ALJ found that Plaintiff's "tremor was consistent with the limitations for her to perform sedentary work with the following additional limitations through the date last insured: occasionally performing postural activities, but never climbing ladders, ropes, or scaffolds; frequently reaching, handling, fingering, and feeling, but only occasionally engaging in overhead reaching; and must avoid exposure to heights and hazards." Tr. 518-19. After indicating that the December 2017 EEG showed no slowing or epileptic activity, the ALJ noted that while Plaintiff's "condition worsened, her impairments and limitations were consistent with the residual functional capacity set forth above through her date last insured." Tr. 519. The ALJ further noted that "although [Plaintiff's] syncope/seizure allegations are non-severe, I nevertheless included limitations of avoiding heights and hazards and avoiding bright/flashing lights or similar visual stimuli out of caution." *Id.*

As set forth above, the ALJ explained how the objective evidence he cited supports his RFC assessment of Plaintiff's upper extremity use. The Fourth Circuit has clarified that while the RFC assessment must include a narrative discussion describing how the evidence supports the ALJ's conclusions, there is no particular language or format to follow so long as it permits meaningful judicial review. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016). Here, the ALJ has satisfied that requirement by discussing the medical findings made throughout Plaintiff's treatment history. *See* Tr. 515-20.

b.  Explanation of One-day Absence from Work

16

In his RFC assessment the ALJ determined that "[b]ecause of headaches, [Plaintiff] must avoid bright/flashing lights or similar visual stimuli; should be exposed to no more than moderate noise levels; and would miss one day of work per month." Tr. 517.

Plaintiff argues that because the ALJ mentions a one-day absence from work twice in his RFC explanation, her limitations support two absences a month. Pl.'s Br. 15. The Commissioner contends that "the ALJ's one day per month off-work limitation was not cumulative, *i.e.*, one day off work for each severe impairment" but instead the ALJ discussed the evidence regarding each of Plaintiff's impairments in a function-by-function manner to account for his RFC finding. Def.'s Br. 21.

In his discussion of his RFC assessment related to Plaintiff's degenerative disc disease of the cervical spine the ALJ made the following finding:

> [T]hrough the date last insured, the claimant's degenerative disc disease of the cervical spine was consistent with the limitations for her to perform sedentary work with the additional limitations of occasionally performing postural activities, but never climbing ladders, ropes, or scaffolds, frequently reaching, handling, fingering, and feeling, but only occasionally engaging in overhead reaching, and avoiding exposure to heights and hazards. I further find that her pain and side effects of medications were consistent with these limitations, in addition the requirement that she would have missed one day of work per month, through the date last insured.

Tr. 518. In his discussion Plaintiff's headaches, the ALJ found that "the specific limitations for the claimant to avoid bright/flashing lights or similar visual stimuli, to have no more than moderate noise levels, and to miss one day of work per month were consistent with her headaches through the date last insured." *Id.*

The court does not find the ALJ erred in his discussion of the one-day-per-month absence from work limitation. Much like his discussion of Plaintiff's other impairments, the ALJ simply reiterated the limitations imposed in his RFC assessment for both Plaintiff's degenerative disc

disease and headaches. For example, he outlined the postural limitations in the RFC in his discussion of Plaintiff's impairments of degenerative disk disease and her tremors. He noted the avoidance of exposure to heights and hazards when discussing her degenerative disk disease, tremors, and syncope/seizures; and he noted avoidance of bright/flashing lights when discussing her headaches and her syncope/seizures. Furthermore, at Step Five, the ALJ discussed his conversation with the VE regarding consistency of the VE's opinion with the DOT. The ALJ noted specifically that "in regard to overhead reaching, light and noise limits, and *missing one day per month requirements*, the vocational expert testified that these limitations are not found withing the DOT concerning any occupation" but are based on his professional knowledge, experience, and personal observations. Tr. 521 (emphasis added). This clearly shows the ALJ was considering only one absence and not two absences per month.

Plaintiff also argues the "ALJ fails to explain how an individual with tremors can perform frequent fingering, which is needed to perform most unskilled sedentary jobs." Pl.'s Br. 17. The Commissioner asserts that Plaintiff "failed to point to any evidence that would support any further limitation, nor does the record contain any." Def.'s Br. 22, n. 4.

The ALJ discussed the objective medical evidence regarding Plaintiff's tremors, including MRIs, and the reports of her orthopedist, neurologist and the consultative examiner of normal sensory and motor functioning of her extremities and normal grip strength. Tr. 517-18. Based on their findings, and the medical evidence, the ALJ concluded Plaintiff could engage in frequent fingering.

The issue is whether there is substantial evidence to support the ALJ's decision that Plaintiff retains the RFC to perform basic work activity. The ALJ's analysis of the evidence provides a logical bridge between the evidence and his RFC findings. *Bennett v. Astrue*, No. 1:10-

CV-1931-RMG, 2011 WL 2470070, at *3. The court finds that the ALJ evaluated the medical evidence of record and, based on the evidence as a whole, he assessed Plaintiff's RFC. Accordingly, the ALJ's RFC assessment regarding Plaintiff's capabilities is supported by substantial evidence. *Ladda v. Berryhill*, 749 F. App'x 166, 173 (4th Cir. 2018) (finding remand unnecessary when the ALJ assessed the plaintiff's capacity to perform relevant functions and when the record in the case was adequate).

2. The ALJ's Evaluation of Plaintiff's Subjective Symptoms

Plaintiff argues that the ALJ failed to cite the records upon which he relied in determining that her subjective reports to physicians and the objective medical findings were inconsistent with Plaintiff's testimony of pain and dysfunction. Pl.'s Br. 19. She argues the ALJ failed to consider "qualifying" information regarding her ability to perform various activities. *Id.* at 20-21. She also contends the ALJ failed to consider the possibility of a "linkage" between evidence showing progressive deterioration of her cervical spine issues prior to her date last insured ("DLI") and the need for another cervical fusion surgery post DLI. *Id.* at 23-24. The Commissioner argues that the ALJ "explicitly considered Plaintiff's subjective complaints and clearly articulated his rationale in explaining why he found these complaints not entirely consistent with the record (Tr. 517-20)." Def.'s Br. 22. The Commissioner contends the "ALJ properly summarized and accounted for Plaintiff's daily activities as one factor in his well-supported decision, one certainly not plagued by mischaracterizations and multiple errors." *Id.* at 26. The Commissioner further argues that "Plaintiff has failed to establish a connection from her impairments during the relevant period to the evidence from after the relevant period" noting that the record documents Plaintiff had an accident post DLI that "resulted in increased pain in her neck, hip, shoulder, and ankle (Tr. 1044, 1046, 1058)." *Id.* at 27.

A claimant's subjective allegations of pain or other symptoms alone can never establish disability. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). Rather, the ALJ must consider "the extent to which [statements about subjective] symptoms can reasonably be accepted as consistent with objective medical evidence and other evidence" in the record. *Id.* SSR 16-3p provides a two-step process for evaluating an individual's symptoms. First, the ALJ must determine whether the individual has a medically determinable impairment "that could reasonably be expected to produce the individual's alleged symptoms." SSR 16-3p, 2017 WL 5180304, at *3. Then the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities . . . ." *Id.* at *4. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.*

a. The ALJ's Consideration of the Record Evidence

The ALJ considered Plaintiff's subjective complaints of pain using the two-step process outlined above. He accurately and thoroughly recounted Plaintiff's hearing testimony, stating:

> At the hearing, the claimant testified that she is unable to work due to pain and numbness in her arms due to her history of cervical surgeries, as well as hand tremors and headaches. She stated that she was laid off of her last job at a daycare, but that she would not be able to still work there due to her inability to lift more than 5 pounds. She stated that she thought the surgery made her numbness and arm pain worse and that she has permanent damage. The claimant stated that she can stand for 15 minutes. She stated that she suffers from headaches that feel like a vice is gripping an[d] twisting her whole head. The claimant indicated that she has headaches 4 times a week that are triggered

by bright lights, loud noises, and certain smells. She also indicated that she has tremors not controlled by medication.

Tr. 517. The ALJ then summarized the objective medical evidence regarding Plaintiff's cervical spine issues, headaches, tremors, and arm/shoulder/neck/hip pain. Tr. 517-19. Although Plaintiff argues the ALJ erred because he concluded she "did not report disabling symptoms to her physicians" what the ALJ actually concluded was that Plaintiff's reports to her physicians "were generally inconsistent with the claimant's testimony of such significant complaints of pain and dysfunction[.]" Tr. 519. Through his discussion of the objective medical evidence the ALJ noted Plaintiff's reported symptoms. For example, in discussing examinations by her treating orthopedist, the ALJ noted that Plaintiff's "pain persisted despite undergoing conservative treatment, including physical therapy." Tr. 517. He noted that while Plaintiff was seen for tremors and complained of "intermittent tingling, numbness, weakness, and pain in her arms" doctors noted that Plaintiff also indicated she had no muscle aches or weakness and did not appear to be in pain. Tr. 518. The ALJ noted that a consultative examiner noted that she had some tenderness and reduced range of motion of the cervical spine, but she had normal motor functioning and grip strength. *Id.* The ALJ also noted that despite her complaints "her physical examinations, imaging, and EMG studies were negative." *Id.* The ALJ cited to Plaintiff's complaints of neck pain and worsening headaches but noted her MRI was unremarkable. *Id.* The ALJ noted Plaintiff's reports of increasing upper extremity tremors but noted she "retained 5/5 muscle strength." *Id.*

The court finds that Plaintiff's citation to selective evidence does not render the ALJ's decision unsupported by substantial evidence because the ALJ's decision reflects careful consideration of the medical evidence as a whole and the limitations that stem from Plaintiff's

impairments. The ALJ adequately explained the reasons supporting his determination that Plaintiff's statements of disabling symptoms were not entirely consistent with the record evidence.

### b. The ALJ's Consideration of Plaintiff's Activities

Plaintiff cites to *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020) to argue that the ALJ erred by omitting qualifying information about her ability to perform particular activities. Pl.'s Br. 21. The Commissioner argues that the *Arakas* case is distinguishable because this case does not involve a fibromyalgia impairment and, here, "the ALJ accurately summarized Plaintiff's activities as part of his analysis (Tr. 519)." Def.'s Br. 26.

In his Listings discussion at Step Three the ALJ noted that Plaintiff "previously testified and reported that she was able to perform household chores, cook, shop for groceries on her good days, and care for her own personal hygiene." Tr. 516. The ALJ noted Plaintiff's hearing testimony that she in unable to lift more than five pounds and that she can stand for 15 minutes. Tr. 517. Citing to Plaintiff's Function Report, the ALJ noted that Plaintiff "previously reported that she could perform household chores, care for her personal hygiene, shop for groceries, and drive a motor vehicle, all of which reveal a greater level of functioning than she alleged." Tr. 519. The ALJ also noted that Plaintiff's prior testimony was that "she would have continued working if there was a position not requiring her to lift more than 10 pounds" but at the most recent hearing she changed it to not lifting more than 5 pounds. *Id.* The ALJ found the five-pound limitation was not supported by the objective findings of record. *Id.*

Plaintiff argues the ALJ's findings reveal a greater level of functioning than she alleged. Pl.'s Br. 21. Plaintiff argues the ALJ omitted the following qualifying information:

> [Plaintiff] said she cleaned on and off as she could, but she had to sit and stand throughout the day. It took her days to clean and she tried to only do it once a week. She could only lift 5 to 10 pounds. Her husband had to do her hair from time to time (Tr. 204-210). [Plaintiff] indicated that she had problems holding on to things

and her arm fell asleep while driving (Tr. 856, 1945).[6]

*Id.*

Both the ALJ and Plaintiff cite to information contained in Plaintiff's Function Report about her daily activities. The ALJ did not materially overstate Plaintiff's activities. The record contains varying statements from Plaintiff regarding her ability to engage in daily activities. For example, although Plaintiff indicated that she can "clean off and on" she also indicated that she cares for her father and she will "fix meals make sure he doesn't fall, do his meds up for each day." Tr. 204. She also noted that with her husband's help she feeds, bathes, and takes her pets to the vet when needed. *Id.* Plaintiff indicated that she had no problem with personal care but she had a hard time hooking her bra and she had difficulty caring for her hair because it was hard to put her arms over her head. *Id.* Plaintiff noted in her Function Report that she is able to prepare her own meals daily, including "complete meals with several courses" although it took longer to prepare. Tr. 205. She also indicated she is able to do cleaning and laundry and it "takes days and try to do once a week." *Id.* She noted that she needed help lifting the basket of clothes. *Id.* Plaintiff indicated the ability to travel by walking and driving or riding in a car. Tr. 206. She also indicated that she could shop for groceries once a week for an hour or more. *Id.* She noted that she can lift 5-10 pounds and she is unable to stand and sit for long periods of time because she would "start hurting." Tr. 208. She noted that she could walk for about a mile before needing to stop and rest for 10-15 minutes. *Id.*

---

[6] The reference about the inability to hold things is from an August 23, 2018 Disability Report-Appeal that indicated a change in Plaintiff's medical condition that occurred June 18, 2018. Tr. 850-56. The court notes that this change occurred after Plaintiff's date last insured. The driving reference is from a March 21, 2016 Progress Note from Tidewater Neurology where Plaintiff reported that "when she holds her arm half way up her arm goes to sleep. Right arm has gone to sleep for a whole hour while she was driving." Tr. 1945. In his assessment the doctor noted they "discussed conservative treatment focused on improving positioning of the arms." Tr. 1946.

At the administrative hearing on September 27, 2109, Plaintiff testified that she is unable to lift more than five pounds as a result of her third neck surgery. Tr. 539. She stated that her husband helps her dress, but she is able to cook although she sometimes drops things when cooking. Tr. 546.

The ALJ's omission of certain qualifying language does not automatically require remand. The relevant inquiry is whether the ALJ's decision is supported by substantial evidence. Given the different statements made by Plaintiff regarding the type of activities she could perform, the ALJ fulfilled his duty to weigh the conflicting evidence and determine which of Plaintiff's statements was most consistent with the evidence of record. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on . . . the ALJ.") (internal citation omitted). Here, the ALJ relied on other evidence besides Plaintiff's daily activities in formulating his RFC assessment including the objective medical evidence and reports to her treating and examining physicians that "were generally inconsistent with the claimant's testimony of such significant complaints of pain and dysfunction." Tr. 519. The ALJ noted that Plaintiff's activities, "when viewed in conjunction with the other inconsistencies regarding the claimant's allegations of pain and dysfunction, further limit the claimant's persuasiveness in discussing her symptoms." *Id.* Like other district court cases, the ALJ's omission of certain qualifying information here does nothing to diminish his discussion of Plaintiff's activities. *May v. Kijakazi*, No. CV 9:20-02197-MGL, 2022 WL 593957, at *4 (D.S.C. Feb. 25, 2022) (citing *Henson v. Berryhill*, C/A No. 1:15-cv-00123-RJC, 2017 WL 5195882, at *8 (W.D.N.C. Nov. 9, 2017) (noting "[a]lthough the ALJ did not accurately recount the limitations put forth on [p]laintiff's daily activities, he nonetheless recounted medical evidence to support his conclusion that [p]laintiff's testimony was not entirely

credible.") (footnote omitted); *Harvey v. Saul*, C/A No. 9:20-cv-00135-TMC, 2021 WL 3012641, at *5–6 (D.S.C. July 16, 2021) (noting although the ALJ omitted certain qualifying language when listing plaintiff's daily activities, this error failed to necessitate remand when the ALJ's decision was ultimately supported by substantial evidence)).

The ALJ did not err in his consideration of Plaintiff's activities.

### c. The ALJ's Consideration of Post-DLI Evidence

Finally, Plaintiff asserts that "it is difficult to understand how the ALJ determined objective findings did not support [her] reports of cervical spine pain and radiating symptoms into her arms when the record shows she required another cervical fusion surgery in 2017." Pl.'s Br. 23. Plaintiff appears to argue that there exists a link between the 2017 surgery and her pre-DLI condition that warrants consideration from the ALJ. *Id.* at 24. The Commissioner argues that "Plaintiff has failed to establish a connection from her impairments during the relevant period to the evidence from after the relevant period." Def.'s Br. 27. The Commissioner notes that Plaintiff was injured in an accident in January 2017 and the accident has no bearing on Plaintiff's condition prior to DLI. *Id.*

"To establish eligibility for Social Security disability benefits, a claimant must show that he became disabled before his DLI." *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012). "Medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI" when the evidence permits an "inference of linkage" between a claimant's post-DLI and pre-DLI condition. *Id.* at 341. "[R]etrospective consideration of evidence is appropriate when the record is not so persuasive as to rule out any linkage of the final condition of the claimant with his earlier symptoms." *Bird*, 699 F.3d at 341 (internal citations omitted). However, where there is insufficient evidence supporting an inference that a claimant's post-DLI

assessment is linked to pre-DLI impairments, the ALJ does not need to give the new assessment

retrospective consideration. *Id.* (citing *Johnson v. Barnhart*, 434 F.3d 650, 655–56 (4th Cir. 2005)

(per curiam)).

> The ALJ's decision contains the following discussion about post-DLI evidence:
>
> I note that in January 2017, after her date last insured, the claimant suffered a
> fall and underwent treatment for right arm/shoulder/neck/hip pain. X-rays
> revealed postoperative changes of the cervical spine with no acute fracture,
> dislocation, or findings. Her physical examination was unremarkable with no
> motor/sensory deficits and normal reflexes. The claimant ultimately required
> another cervical discectomy and fusion at C5-6 in October 2017. She also
> underwent Botox injections that resulted in 50% improvement in her
> headaches. A December 2017 EEG showed no slowing or epileptic activity.
> (Exhibits B3F; B4F; B6F). I note that while the claimant's condition worsened,
> her impairments and limitations were consistent with the residual functional
> capacity set forth above through her date last insured.

Tr. 519.

> This case is distinguishable from *Bird*. In *Bird*, the claimant's post-DLI diagnosis of PTSD

had not been diagnosed previously, nor were there medical records dated before his DLI. Here,

however, the record contains well-documented and direct evidence of Plaintiff's history of cervical

spine and arm pain, and of her treatment prior to her DLI, which was fully considered by the ALJ.

Tr. 517-18. Furthermore, the ALJ expressly considered the post-DLI evidence regarding Plaintiff's

injury and subsequent surgery. Medical records indicate that on January 5, 2017 Plaintiff presented

to the Trident hospital emergency department complaining of "pain in her right ankle, right hip,

lower back, right shoulder, and neck secondary to falling through the floor at her house just [prior

to arrival]." Tr. 1040. Tellingly, the court notes that in making her linkage argument Plaintiff omits

any discussion of the post-DLI intervening event of a fall. *Cf. Neice v. Colvin*, No. 7:14CV00024,

2015 WL 1169216, at *8 (W.D. Va. Mar. 13, 2015) (finding that doctor's records related back to

the relevant time period when there was no evidence of an intervening event suggesting why a change in claimant's mental health could have occurred).

Because the ALJ properly considered post-DLI evidence, Plaintiff's claim is without merit. *See Joe v. Colvin*, No. 8:14-CV-01221-JDA, 2015 WL 4878886, at *14 (D.S.C. Aug. 14, 2015) (unpublished) ("[C]ontrary to Plaintiff's assertions, the ALJ expressly considered the evidence dated after Plaintiff's DLI . . . [Thus] Plaintiff's argument ... is without merit.").

Here, the ALJ followed the applicable regulations in considering and discounting some of Plaintiff's subjective complaints. Plaintiff's disagreement with the ALJ's decision is no reason to overturn it. *Johnson v. Barnhart*, 434 F.3d at 653 (quoting *Craig*, 76 F.3d at 589). The court therefore finds that Plaintiff has failed to show that the ALJ's evaluation of Plaintiff's subjective complaints is unsupported by substantial evidence or controlled by an error of law.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through an application on an incorrect legal standard. See *Craig*, 76 F.3d at 589; see also 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

March 11, 2022                                    Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge